This Opinion is a
Precedent of the TTAB

Oral Hearing: April 13, 2018  Mailed: August 12, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*The Pierce-Arrow Society*

*v.*

*Spintek Filtration, Inc.*
_____

Opposition No. 91224343
_____

Alan S. Cooper of Westerman Hattori Daniels & Adrian, LLP for Pierce-Arrow Society.

Arthur G. Schaier, Fatima Lahnin and Damian K. Gunningsmith of Carmody Torrance Sandak & Hennessey LLP for Spintek Filtration, Inc.

_____

Before Zervas, Lynch and Coggins,
Administrative Trademark Judges.

Opinion by Zervas, Administrative Trademark Judge:

Spintek Filtration, Inc. ("Applicant") seeks to register on the Principal Register

the standard character mark PIERCE-ARROW for "automobiles" in Class 12.[1]

The Pierce-Arrow Society ("Opposer") asserts, inter alia, ownership of:

_____

[1] Application Serial No. 86500604, filed January 12, 2015, pursuant to Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), asserting a bona fide intent to use the mark in commerce.

(1) Registration No. 1058801 (the '801 registration) for the typed mark[2] PIERCE ARROW SOCIETY (SOCIETY disclaimed), for "indicating membership in a national organization whose aim is to foster and preserve interest in Pierce Arrow motor cars" in Class 200;[3]

(2) Registration No. 1051583 for the mark



(SOCIETY and FOUNDED 1957 disclaimed) also for "indicating membership in a national organization whose aim is to foster and preserve interest in Pierce Arrow motor cars" in Class 200;[4] and

(3) Registration No. 2625651 for the mark



(FOUNDATION disclaimed) for "educational and entertainment services, namely the operation of a museum devoted to specific classic or antique motorcars and related products and artifacts and offering educational seminars and workshops in furtherance of the appreciation of

---

[2] Prior to November 2, 2003, "standard character" marks were known as "typed" drawings. A typed mark is the legal equivalent of a standard character mark. *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012) ("until 2003, 'standard character' marks formerly were known as 'typed' marks.").

[3] Registered February 8, 1977 (thrice renewed), claiming first use and first use in commerce in August 1957.

[4] Registered October 26, 1976 (thrice renewed), claiming first use and first use in commerce in 1964.

specific classic or antique motorcars and related products and artifacts" in Class 41.[5]

As grounds for opposition, Opposer alleges (i) false suggestion of a connection under Trademark Act Section 2(a), 15 U.S.C. §1052(a);[6] and (ii) likelihood of confusion between its registered marks and Applicant's mark under Trademark Act Section 2(d), 15 U.S.C. §1052(d).

Opposer also claimed deceptive misdescriptiveness under Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1), but did not discuss this claim in its brief. In the oral hearing, Opposer confirmed that it waives its claim of deceptive misdescriptiveness. We therefore give no further consideration to this claim. *See Corporacion Habanos S.A. v. Guantanamera Cigars Co.*, 86 USPQ2d 1473, 1474 n.2 (TTAB 2008).

Applicant, in its answer, denied the salient allegations in the amended notice of opposition. The case has been fully briefed.

---

[5] Registered September 24, 2002 (once renewed), claiming first use and first use in commerce on July 20, 1998.

[6] A proper pleading of false suggestion of a connection asserts: (i) the applicant's mark is the same as, or a close approximation of, the opposer's previously used name or identity; (ii) that the mark would be recognized as such, in that it points uniquely and unmistakably to the opposer; (iii) that the opposer is not connected with the goods or services provided by the applicant under the mark; and (iv) that the opposer's name or identity is of sufficient fame or reputation that when the applicant's mark is used on its goods, a connection with the opposer would be presumed. *See Nike, Inc. v. Palm Beach Crossfit Inc.*, 116 USPQ2d 1025, 1031 (TTAB 2015). Opposer's claim does not contain all of these elements and hence has not been properly pleaded. Because the parties have tried the improperly pleaded claim on its merits and addressed it in their briefs, we find that the claim has been tried by the implied consent of the parties. *See WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1036 (TTAB 2018); Fed. R. Civ. P. 15(b)(2); TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 314 (June 2019).

I. The Record

In addition to the pleadings, the record automatically includes the involved application file pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b). The parties have also submitted the following:

    a. Opposer's Evidence

      1. Testimony Declaration of G. Marc Hamburger, Opposer's former President, Treasure and current Historian, with Appendices A through Z ("Hamburger Decl.") (21 TTABVUE), including printouts of Opposer's pleaded registrations from the USPTO's Trademark Electronic Search System (TESS) database, establishing the status, and Opposer as the owner, of these registrations;[7]

      2. Testimony Declaration of Steven Rossi, Opposer's former Director and current Director of The Pierce-Arrow Foundation, with Appendix A (a CD with a video documentary) ("Rossi Decl.") (22 TTABVUE);[8]

      3. Cross-Examination Deposition of Steven Linden, identified as a "Qualified Appraiser and Qualified Personal Property Appraiser … specializing in classic and collector motor vehicles,"[9] Applicant's designated expert witness, with Exhibits 1 - 14 (37 TTABVUE);

      4. Cross-Examination Deposition of William Greene, Applicant's President, with Exhibits 1 - 16 (38 TTABVUE); and

      5. Rebuttal Testimony Declaration of Mr. Hamburger with Exhibits A and B ("Hamburger Rebuttal Decl.") (39 TTABVUE).

---

[7] Mr. Hamburger testified that "Opposer is the record owner of Registration Nos. 1,058,801, 1,051,583 and 2,625,651, each of which is subsisting and valid." Hamburger Decl. ¶ 20, 21 TTABVUE 9.

[8] A web address is also identified as Exh. A to the Rossi Decl. We may consider the CD but not the content residing at the Internet page corresponding to the web address provided by Opposer. *See* TBMP §106.03.

[9] 27 TTABVUE 2.

　　b. Applicant's Evidence

　　　1. Testimony Declaration of Mr. Linden with Exhibits 1 - 14 ("Linden Decl.") (27 & 28 TTABVUE);

　　　2. Testimony Declaration of Mr. Greene with Exhibits 1 - 16 (29 TTABVUE);

　　　3. Applicant's Notice of Reliance with Exhibits 1 - 13 (30 & 31 TTABVUE);

　　　4. Cross-Examination Deposition of Mr. Rossi with Exhibit 1 - 3 (41 TTABVUE); and

　　　5. Cross-Examination Deposition of Mr. Hamburger with Exhibits 1 -17 ("Hamburger Cross Dep.") (43 TTABVUE).

## II. Objections

　　a. Mr. Linden

Opposer challenges portions of Mr. Linden's declaration and qualifications to provide expert testimony[10] on certain subjects and asks us not to give probative value to ¶¶ 63, 64, 65, 69, and 70 of Mr. Linden's declaration. In particular, Opposer asserts that the Board should not consider such paragraphs which "provide an expert opinion directed to the public perceptions directly related to the §§ 2(a) and (d) grounds for opposition because [they] are not based on any survey taken to establish the required perceptions"; and "the testimony of an expert witness on the ultimate issue of whether confusion - and the underlying public perceptions - is likely should not be allowed unless that expert has designed and conducted an appropriate, admissible survey directed to ascertaining the relevant public perceptions," citing 4 J. THOMAS

---

[10] Opposer states, "We respectfully submit that Mr. Linden simply lacks the experience and expertise to testify as an expert witness with respect to the likelihood of confusion issue in this proceeding." Opposer's brief at 8, 47 TTABVUE 12.

MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:2.7[5] (5th ed. 2017).[11]

Because the Board disregards opinion testimony regarding the ultimate disposition of the claims asserted, *see Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1755 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014), Opposer's objection to ¶¶ 69 and 70 is sustained. Opposer's objection to ¶¶ 64 and 65 is also sustained because Mr. Linden's testimony in these paragraphs regarding the renown of Opposer and its marks is beyond Mr. Linden's area of expertise (which we find concerns antique cars, not antique car clubs). As for Opposer's objection to ¶ 63 and Mr. Linden's statement that "a significant portion of purchasers of automobiles are not aware of the classic Pierce-Arrow motor vehicle," we need not consider this statement because, as explained later in this opinion, Opposer's evidence does not establish notoriety of antique Pierce-Arrow motor vehicles. With regard to the remaining statements in Mr. Linden's declaration, any objection thereto is overruled because Opposer has not specified the statements to which it objects.

> b. Mr. Greene

Opposer objects to Applicant's submission of "coexisting registrations of similar marks for automobiles and for associations/clubs and/or museum services owned by different entities" such as the registration for PACKARD submitted through Mr.

---

[11] Opposer's brief at 5-6, 47 TTABVUE 9-10.

Greene's declaration.[12] According to Opposer, "the probative value of these third-party registrations is minimal given the fact that Applicant did not make any effort to present evidence of the concurrent use of these marks in the marketplace" and did not determine if any had been involved in any opposition or cancellation proceeding.[13] We overrule the objection; while third-party registrations are not evidence of third-party use in the likelihood of confusion context, *Smith Bros. Mfg. Co. v. Stone Mfg. Co.*, 177 USPQ 462, 463 (CCPA 1973), they are relevant to the extent they may suggest "that businesses in these two industries believe that their respective goods are distinct enough that confusion between even identical marks is unlikely." *In re Thor Tech, Inc.*, 113 USPQ2d 1546, 1549 (TTAB 2015). However, the probative value of such third-party registrations is limited where, as here, the records on which registration was allowed are not before us. *See In re Nett Designs Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001).

### c. Mr. Hamburger

Applicant objects to portions of Mr. Hamburger's declaration and exhibits thereto based on various grounds including hearsay, lack of personal knowledge, lack of authentication, irrelevance and lack of foundation. These objections are numerous and we see no compelling reason to address the objections individually except insofar as they relate to the outcome-determinative evidence and testimony. We add that we have considered all of Mr. Hamburger's testimony and exhibits, keeping in mind

---

[12] *Id*. at 8, 47 TTABVUE 12.

[13] *Id*. at 8-9, 47 TTABVUE 12-13.

Applicant's objections, and have accorded appropriate probative value to the testimony and evidence according to its merits. We have discussed whatever testimony and exhibits we have given weight to, or discounted, as we explain herein, and the remainder is neutral.

## III. Background

The Pierce-Arrow Motor Car Company began manufacturing PIERCE-ARROW automobiles in 1901.[14] Mr. Rossi testified that "the PIERCE-ARROW automobile became a status symbol and was one of the highest quality automotive products in the years between 1901 and 1938 when The Pierce-Arrow Motor Car Company ceased production."[15] Woodrow Wilson, President of the United States from 1913 to 1921, selected a 1919 PIERCE-ARROW automobile to serve as the presidential limousine.[16] Every president of the United States from William Howard Taft through Franklin D. Roosevelt was transported by PIERCE-ARROW motor vehicles.[17]

Opposer is a non-profit organization founded in 1957 that has been actively engaged in the preservation of the heritage of and fostering of interest in PIERCE-ARROW automobiles that were produced and sold by The Pierce-Arrow Motor Car

---

[14] Rossi Decl. ¶7, 22 TTABVUE 3. The evidence reflects consistent use of a hyphen between PIERCE and ARROW when referring to The Pierce-Arrow Motor Car Company and the trademark for its car. The mark of the '801 registration, however, does not use a hyphen. Thus, we include a hyphen in all references to this company, its trademark and Opposer, but not in the mark of the '801 registration.

[15] Rossi Decl. ¶ 11, 22 TTABVUE 4.

[16] Hamburger Decl. ¶ 11, 21 TTABVUE 5.

[17] *Id*. at ¶ 12, 21 TTABVUE 6.

Company.[18] The Pierce-Arrow Museum in Hickory Corners, Michigan, was founded in 1999 by members of Opposer, is operated by Opposer, and is located on the 90-acre Gilmore Car Museum campus.[19] Approximately 19 restored PIERCE-ARROW automobiles were on display in 2017.[20] Since the 1960s, Opposer has published a quarterly magazine entitled "The Arrow" which discusses the past, present and future of PIERCE-ARROW motorcars, provides information regarding the history of The Pierce-Arrow Motor Car Company, and contains articles describing Opposer's annual meets, as well as the vehicles that win awards at those meets.[21] Opposer has participated in the Hershey, Pennsylvania, Annual Flea Market since 2004, where it displays PIERCE-ARROW automobiles.[22]

Opposer assists members of its organization in their preservation and restoration of PIERCE-ARROW motor cars.[23] Opposer publishes (i) a "Service Bulletin" six times annually that provides advice and instructions with respect to the maintenance and restoration of PIERCE-ARROW motor cars, and (ii) the "Emporium" "six times annually which provides a marketplace for the purchase of PIERCE-ARROW

---

[18] *Id.* at ¶¶ 3-6, 21 TTABVUE 2-3.

[19] *Id.* at ¶ 8, 21 TTABVUE 4.

[20] *Id.*

[21] *Id.* at ¶ 9, 21 TTABVUE 5.

[22] *Id.* ¶ 10, 21 TTABVUE 5.

[23] "Motorcar" or "motor car" which appears in the recitation of services in the '801 registration is defined as "automobile" in the online version of the Merriam-Webster Dictionary accessed at https://www.merriam-webster.com/dictionary/motorcar. The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594, 596 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed format or regular fixed editions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006). Thus, "motor car" and "automobile" are interchangeable terms.

automobiles and parts and a Parts and Service Directory which identifies vendors of PIERCE-ARROW parts and related installation services."[24] Opposer has contracted for third parties to manufacture certain parts for PIERCE-ARROW automobiles—such as distributor caps, running board mats, exhaust manifolds and headlight lenses—which Opposer then sells directly to owners of PIERCE-ARROW automobiles.[25]

Opposer is not a legal successor to, and Opposer did not acquire any assets from, The Pierce-Arrow Motor Car Company, or any successor in interest to that company, including any rights to or in the PIERCE-ARROW mark.[26]

## IV.   Standing

Standing is a threshold issue that must be proven by a plaintiff in every inter partes case. To establish standing in an opposition or cancellation proceeding, a plaintiff must show "both a 'real interest' in the proceedings as well as a 'reasonable basis' for its belief of damage." *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014) (quoting *ShutEmDown Sports, Inc., v. Lacy*, 102 USPQ2d 1036, 1041 (TTAB 2012)); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

---

[24] Hamburger Decl. ¶ 15, 21 TTABVUE 7.

[25] *Id*. ¶ 15-17, 21 TTABVUE 7-8.

[26] Opposer's Answer to Int. No. 2, 30 TTABVUE 12; Hamburger Cross Dep. at 12, 15, 43 TTABVUE 15, 18.

Opposer's standing is established by its pleaded registrations, which the record shows to be valid and subsisting, and owned by Opposer. *See, e.g.*, *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (party's ownership of pleaded registration establishes standing). Applicant does not dispute that Opposer has standing to oppose registration of Applicant's mark.

## V.    False Suggestion of a Connection

Section 2(a) of the Trademark Act prohibits the registration of a mark that consists of or comprises matter that may falsely suggest a connection with "persons, living or dead, institutions, beliefs, or national symbols …." 15 U.S.C. § 1052(a). False suggestion of a connection under the Trademark Act evolved from the rights of privacy and publicity, and was intended to preclude registration of a mark that conflicts with another's rights in one's persona or identity. *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.*, 703 F.2d 1372, 217 USPQ 505, 509 (Fed. Cir. 1983); *see also Bridgestone/Firestone Research Inc. v. Auto. Club de L'Ouest de la France*, 245 F.3d 1359, 58 USPQ2d 1460, 1463 (Fed. Cir. 2001) ("The rights protected under the §2(a) false suggestion provision are not designed primarily to protect the public, but to protect persons and institutions from exploitation of their persona."). To establish that a proposed mark falsely suggests a connection with a person or an institution, the following four elements must be shown:

1. The mark is the same as, or a close approximation of, the name or identity previously used by another person or institution;

2. The mark would be recognized as such, in that it points uniquely and unmistakably to that person or institution;

3. The person or institution named by the mark is not connected with the activities performed by the applicant under the mark; and

4. The fame or reputation of the person or institution is such that, when the mark is used with the applicant's goods or services, a connection with the person or institution would be presumed.

*Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps.*, 217 USPQ at 508-10. *See also Bos. Athletic Ass'n v. Velocity, LLC*, 117 USPQ2d 1492, 1495 (TTAB 2015); *Ass'n Pour La Defense et la Promotion de L'Oeuvre de Marc Chagall dite Comite Marc Chagall v. Bondarchuk*, 82 USPQ2d 1838, 1842 (TTAB 2007); *Buffett v. Chi-Chi's, Inc.*, 226 USPQ 428, 429 (TTAB 1985).

We address the four elements in turn below.

1. Whether PIERCE-ARROW is, or is a close approximation of, Opposer's name or identity, as previously used by Opposer.

The record reflects that Opposer has used its name The Pierce-Arrow Society prior to the filing date of Applicant's intent to use application.[27] We hence consider whether Applicant's PIERCE-ARROW mark is a close approximation of Opposer's name.

The Board has said that "the similarity required for a 'close approximation' is akin to that required for a likelihood of confusion under § 2(d) and is more than merely 'intended to refer' or 'intended to evoke.'" *Bos. Athletic Ass'n v. Velocity*, 117 USPQ2d at 1497 (citation omitted). Applicant's mark must do more than simply bring Opposer's name to mind. *Id. See also Bos. Red Sox Baseball Club LP v. Sherman*, 88

---

[27] Hamburger Decl. ¶ 1, 12 TTABVUE 2.

USPQ2d 1581 (TTAB 2008) (test for false suggestion of a connection more stringent than in disparagement, where reference to persona suffices).

We find that PIERCE-ARROW is a close approximation of Opposer's name, The Pierce-Arrow Society. The article 'THE' in Opposer's name has no source-indicating significance and fails to distinguish the designations. *See In re The Place Inc.*, 76 USPQ2d 1467, 1468 (TTAB 2005) ("we find that the definite article THE and the generic term BAR are not distinctive terms, and they add no source-indicating significance to the mark as a whole."). "Society" merely identifies the nature of Opposer's entity and serves only to call attention to its referent, the term "Pierce-Arrow," which is common to Opposer's name and Applicant's mark.[28]

The first element of the *Univ. of Notre-Dame du Lac* test therefore is satisfied.

2. The mark would be recognized as such, in that it points uniquely and unmistakably to that person or institution.

The Federal Circuit has stated that "under concepts of the protection of one's 'identity,' … [a] critical requirement is that the name (or an equivalent thereof) claimed to be appropriated by another must be unmistakably associated with a particular personality or 'persona.'" *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps.*, 217 USPQ at 509. "[I]t is not sufficient to show merely prior identification with the name adopted by another." *Id.* at 509. "The protection afforded a name or its equivalent under Section 2(a) is acquired only when the name claimed to be

---

[28] "Society" is defined in the online version of THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (https://www.merriam-webster.com/dictionary/society) as "[a]n organization or association of persons engaged in a common profession, activity, or interest: *a folklore society; a society of bird watchers*." We take judicial notice of this definition.

appropriated points 'uniquely and unmistakably' to the plaintiff's 'persona,' that is the personal or trade identity of the claimant." *Bos. Athletic Ass'n v. Velocity*, 117 USPQ2d at 1497 (citing *Buffett v. Chi-Chi*, 226 USPQ at 429). *See also Hornby v. TJX Cos. Inc.*, 87 USPQ2d 1411, 1424 (TTAB 2008) ("[T]he name claimed to be appropriated by the defendant must point uniquely to the plaintiff.").

Opposer's evidence and arguments do not persuade us that PIERCE-ARROW, as a close approximation to Opposer's name, points uniquely and unmistakably to Opposer. In addition to itself, Opposer maintains that its name refers to the defunct The Pierce-Arrow Motor Car Company or the cars made by that company. According to Opposer, "Applicant's mark PIERCE-ARROW would be recognized as the same as or a close approximation of the … identity of the antique automobiles";[29] and "Applicant's mark PIERCE-ARROW … falsely suggests a connection with antique PIERCE-ARROW cars which are still in existence and with Opposer which actively and extensively uses the mark PIERCE-ARROW in various forms in connection with services relating to the preservation of the heritage of the original PIERCE-ARROW cars."[30] It adds that it "does not claim to be a legal successor of The Pierce-Arrow Motor [Car] Company which went bankrupt in 1938. … Rather, it is Opposer's position that it is the de facto successor to The Pierce-Arrow Motor Car Company with respect to the preservation of the memory of the antique PIERCE-ARROW automobiles produced by The Pierce-Arrow Motor [Car] Company and the protection

---

[29] Opposer's reply brief at 5, 50 TTABVUE 10.

[30] Opposer's reply brief at 3-4, 50 TTABVUE 8-9.

of the PIERCE-ARROW mark."[31] Opposer's reliance on three asserted "identities" is reason enough for us to find that Applicant's mark does not point uniquely and unmistakably to Opposer. *See In re Midwest Tennis & Track Co.*, 29 USPQ2d 1386, 1388 (TTAB 1993) ("In particular, due to the variations in possible meaning or connotation for the term 'OLYMPIAN GOLDE,' we cannot say on the basis of the present record that applicant's mark points uniquely and unmistakably to the USOC.").

Because Opposer does not claim to be a legal successor of The Pierce-Arrow Motor Car Company, Applicant maintains that Opposer's Section 2(a) claim fails under *In re Wielinski*, 49 USPQ2d 1754 (TTAB 1998), *overruled in part on other grounds*, *In re WNBA Enters. LLC*, 70 USPQ2d 1153 (TTAB 2003). In that case, the Board considered a refusal of the mark DIAMOND T for goods including trucks under Section 2(a) as falsely suggesting a connection with the defunct Diamond T Motor Truck Company. That company was started in 1905, last used its trademarks in the 1960s, and eventually went out of business. The Board reversed the examining attorney's Section 2(a) refusal, stating:

> [A]lthough the former business was a juristic person, it no longer exists, and we have no basis for concluding that anyone else is entitled to assert the right of that defunct business. In the absence of evidence that some person or ongoing business is the successor-in-interest to the Diamond T Motor Truck Company, whatever rights it had under Section 2(a) were extinguished when Diamond T Motor Truck Company ceased to exist.

---

[31] Opposer's reply brief at 7, 50 TTABVUE 12. *See* Hamburger Cross Dep. at 14-14, 43 TTABVUE 17-18.

49 USPQ2d at 1758.

Opposer argues that *In re Wielinski* is distinguishable because of Opposer's "active and extensive use of the mark PIERCE-ARROW in various forms in connection with services relating to the preservation of the heritage of the original PIERCE-ARROW cars."[32] We are not persuaded that Opposer's use of marks containing PIERCE-ARROW as collective membership indicators or for educational services somehow effectuated a transfer of the goodwill associated with the mark PIERCE-ARROW for automobiles to Opposer. Even assuming that the defunct car company which Opposer claims as its "de facto" predecessor[33] had name or identity rights in PIERCE-ARROW, absent any showing that some person or ongoing business was or is the successor-in-interest to that company, whatever rights the defunct entity had were extinguished when it went bankrupt and ceased to exist. In this case, The Pierce-Arrow Motor Car Company's rights were extinguished when it went out of business and there was no assignment of any interest to another.[34] *See In re MC S.r.l.*, 88 USPQ2d 1378, 1381 (TTAB 2008) (reversing a refusal based on false suggestion of a connection with singer Maria Callas, stating, "after evaluating all of the evidence, significant doubt remains as to whether there is a successor in interest to Maria Callas' rights in her name or persona"). Because there is no evidence of a successor to any rights the defunct

---

[32] Opposer's reply brief at 3, 50 TTABVUE 8. In this regard, the record reflects that Opposer opposed registration of two other marks and petitioned to cancel one mark, and the three cases were resolved pre-trial. Hamburger Decl. ¶ 24, 21 TTABVUE 9-10, Exh. Z Hamburger Decl., 21 TTABVUE 160-165.

[33] Opposer's reply brief at 7, 50 TTABVUE 12.

[34] Rossi Decl. ¶ 11, 22 TTABVUE 4.

company had in the brand name for the automobile it produced, or any name or identity of the company incorporating the brand name, there was no successor to the company who could have passed rights of any type, years later, on to Opposer. Opposer has not established that it may claim rights in the name or identity of the defunct company, if any such rights existed, and we conclude that Opposer's Section 2(a) claim is foreclosed for the reasons explained in *In re Wielinski*.

In addition, we observe that Opposer, in its arguments, conflates the **mark** for the car produced by its original manufacturer with a "name or identity." Although the first element of the test is akin to similarity of the marks under Section 2(d), overall Section 2(a) offers protection different in kind than Section 2(d) as was made clear in *In re Wielinski* and as explained below. Opposer states at p. 2 of its reply brief that "'falsely suggests a connection with' in § 2(a) is roughly equivalent to the phrase 'to be likely … to cause confusion['] in §2(d)."[35] While there may be some analogy between these statutory provisions, our primary reviewing Court has held that, "[c]learly the same standard cannot be adopted for § 2(a) as for § 2(d)." *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps.*, 217 USPQ at 508.

As the Board explained in *In re White*, 73 USPQ2d 1713, 1718 (TTAB 2004), while, decades ago, "the Court of Customs and Patent Appeals considered a Section 2(a) false suggestion claim, at least when brought by commercial plaintiffs, to be akin to a Section 2(d) likelihood of confusion claim," that conception evolved into the current standard articulated in *Univ. of Notre Dame du Lac*. *In re White* went on to explain

---

[35] 50 TTABVUE 7.

- 17 -

that "[a] Section 2(a) false suggestion case does not involve anything like the analysis … as would be involved if this were a Section 2(d) case involving a question of likelihood of confusion." *Id.* (citing *In re Wielinski*, 49 USPQ2d at 1757 ("Section 2(a) … is not about likelihood of confusion with trademarks. That problem is covered by Section 2(d) of the Act.")). Thus, Opposer's analysis is not consistent with the current standard governing Section 2(a) claims.

Opposer has not satisfied the second element of the *Univ. of Notre-Dame du Lac* test.

3. The person or institution named by the mark is not connected with the activities performed by the applicant under the mark.

Opposer has satisfied the third element of the *Univ. of Notre-Dame du Lac* test because Applicant and its activities are not connected to Opposer. *See Hornby v. TJX Cos.*, 87 USPQ2d at 1424 (regarding the third factor, stating, "[i]t is also clear that she [Twiggy] is not connected with respondent, and did not give respondent permission to use her name as a trademark for its goods."). Applicant and its activities are also not connected to the antique PIERCE-ARROW cars or The Pierce-Arrow Motor Car Company.

4. The fame or reputation of the person or institution is such that, when the mark is used with the applicant's goods or services, a connection with the person or institution would be presumed.

Opposer has not met the fourth element of the test. Opposer has not established that Opposer is famous or has any reputation. Nor has Opposer established that there was any such fame or reputation in the defunct The Pierce-Arrow Motor Car

Company which survives and has somehow been transferred to Opposer.[36] Only 2,400 PIERCE-ARROW vehicles are in existence.[37] Additionally, Opposer has only about 1,000 members,[38] its membership is declining,[39] its advertising is limited[40] and its annual meets during the summer attract fewer than 1,000 attendees.[41] There is no material in the record from major media sources discussing Opposer or antique PIERCE-ARROW automobiles. Opposer participates annually in the Hershey, Pennsylvania Annual Flea Market and has a museum at Hickory Corners, Michigan, but Opposer has not established the number of visitors to the flea market and museum.[42] As noted earlier in this decision, U.S. presidents have used PIERCE-ARROW vehicles as their limousines; this fact, however, does not persuade us that the defunct car company's automobiles are famous, as it has been approximately 75 years since those automobiles were used by U.S. presidents. In sum, Opposer has not

---

[36] Opposer submits that "[t]he mark PIERCE-ARROW has sufficient fame and reputation as a symbol of a high quality automobile that the public would presume that the mark PIERCE-ARROW, as used by Applicant, is connected to the antique PIERCE-ARROW automobiles whose heritage and goodwill is preserved by Opposer." Opposer's reply at 5, 50 TTABVUE 10. The test articulated in *Univ. of Notre Dame du Lac* considers whether "the person or institution" has fame or a reputation, and not whether a mark has fame or a reputation.

[37] Hamburger Cross Dep. at 41-42; 43 TTABVUE 44-45.

[38] Opposer's Answer to Int. No. 20, 30 TTABVUE 20-21; Hamburger Rebuttal Decl. ¶ 3, 39 TTABVUE 2.

[39] Hamburger Rebuttal Decl. ¶¶ 3; 39 TTABVUE 2.

[40] Opposer's Supp. Answer to Int. Nos. 12 & 19, 31 TTABVUE 37-38.

[41] Hamburger Cross Dep. at p. 52-53, 43 TTABVUE 55-56.

[42] Hamburger Decl. ¶¶ 8, 10, 21 TTABVUE 4-5. Opposer has not provided a number of attendees which we can consider; Applicant has objected to the webpage Opposer relies on, on the basis of hearsay, for the number of attendees. *See* Objection No. 3 in Applicant's appendix of objections, 49 TTABVUE 48-49. *See Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1467 n.30 (TTAB 2014) (Internet webpage evidence admissible only to show what has been printed and not for the truth of what has been printed).

established that "a substantial number of people have knowledge or interest in either the former company or its abandoned trademarks" or that any rights have been transferred to Opposer. *In re Wielinski*, 49 USPQ2d at 1757 (record did not establish fame of defunct manufacturer of trucks, truck parts, etc., which had no successor-in-interest and had abandoned marks). Thus, the showing of fame or reputation required under Section 2(a) has not been established on this record.

In sum, because Opposer has not satisfied all of the four elements of the *Univ. of Notre-Dame du Lac* test, Opposer's Section 2(a) claim is dismissed.

## VI.    Priority and Likelihood of Confusion

Opposer's pleaded registrations are of record, and because there is no pending counterclaim to cancel any one of Opposer's pleaded registrations, priority is not an issue with respect to the services covered by the registrations. *Penguin Books Ltd. v. Eberhard*, 48 USPQ2d 1280, 1286 (TTAB 1998) (citing *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974)). We focus on the '801 registration for the mark PIERCE ARROW SOCIETY in typed form because the mark identified in that registration is closest to the applied-for mark. If there is no likelihood of confusion with respect to the mark of this registration, there will be no likelihood of confusion with respect to Opposer's other pleaded marks. *See The N. Face Apparel Corp. v. Sanyang Indus. Co.*, 116 USPQ2d 1217, 1225 (TTAB 2015).

Our determination is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In

considering the evidence of record on these factors, we keep in mind that "[t]he fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods [or services] and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976). We need to consider only the factors that are relevant and for which evidence is of record. *M2 Software Inc. v. M2 Commc'ns Inc.*, 450 F.3d 1378, 78 USPQ2d 1944, 1947 (Fed. Cir. 2006).

Opposer's '801 registration concerns a collective membership mark.[43] We therefore are not dealing with "services" per se, but the indication of membership in an automobile club. The Board, in *Carefirst of Md. Inc. v. FirstHealth of the Carolinas Inc.*, 77 USPQ2d 1492, 1512-13 (TTAB 2005), explained the analysis of collective membership marks in the context of Section 2(d):

> Although the ultimate inquiry is the same, the analysis under Section 2(d) with respect to collective membership marks is somewhat different from that with respect to trademarks or service marks. The trademark or service mark analysis typically involves … a determination of likelihood of confusion among purchasers or users as to the source of goods or services. However, a collective membership mark does not involve purchasers of goods or services. The sole purpose of a collective membership mark is to indicate membership in an organization.

---

[43] Section 45 of the Trademark Act, 15 U.S.C. § 1127, defines "collective mark" in relevant part as "a trademark or service mark" used by the members of a cooperative, an association, or other collective group or organization, and includes marks indicating membership in a union, an association, or other organization. Collective membership marks are "not used by the sellers of anything. They are used to signify membership of an individual." 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §19.101 (5th ed. March 2019 Update).

> While goods and services may be provided by members of an organization, a collective membership mark, as used or displayed by the members of an organization, serves only to identify the fact that such members belong to the collective organization and to inform relevant persons of the members' association with the organization. *Allstate Life Insurance Co. et al. v. Cuna International, Inc.*, 169 USPQ 313 (TTAB 1971). Thus, the finding of likelihood of confusion between a collective membership mark and a trademark or service mark is not based on confusion as to the source of any goods or services that happen to be provided by the members of the collective organization. Rather, the question is whether relevant persons are likely to believe that the trademark owner's goods and/or services emanate from or are endorsed by or in some other way associated with the collective organization.

*See also In re Code Consultants Inc.*, 60 USPQ2d 1699, 1701 (TTAB 2001) ("[T]he question is whether relevant persons are likely to believe that the trademark owner's goods or services emanate from or are endorsed by or in some other way associated with the collective organization."); MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §19.101 (5th ed. March 2019 update) ("A registered collective membership mark can serve to bar the later registration of a trademark or service mark if the relevant group of persons would be likely to believe that the goods or services come from or are endorsed by or associated with the collective organization.").

We look to the identification of goods or services to determine the relevant consuming population. *In re Gulf Coast Nutritionals Inc.*, 106 USPQ2d 1243, 1247 (TTAB 2013). Consumers of Applicant's goods include prospective purchasers of new and used cars. Relevant purchasers "for purposes of a collective membership mark, would not consist of 'purchasers,' but rather those persons or groups of persons for

whose benefit the membership mark is displayed." *Carefirst of Md. Inc. v. FirstHealth of the Carolinas Inc.*, 77 USPQ2d at 1513. The intersection of these groups would include prospective purchasers of new and previously owned automobiles *and* current or prospective members of an organization whose mission is to foster and preserve interest in motorcars with the PIERCE-ARROW brand. While there may be current or prospective members of Opposer's society that are not current or prospective owners of new or used automobiles, the record establishes that many members are such.

Thus, we consider whether Applicant's goods and the indication of membership in an organization whose aim is to foster and preserve interest in PIERCE-ARROW motor cars are sufficiently related that, if similar marks were used in connection with them, such prospective purchasers of Applicant's automobiles and current or prospective members of Opposer's organization would be likely to believe that Applicant's automobiles are sponsored by or in some way affiliated with Opposer's organization.

a. The Marks

We turn to the marks, comparing them for similarities and dissimilarities in appearance, sound, connotation and commercial impression. *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USPQ2d at 1692. While likelihood of confusion cannot be predicated on dissecting the marks into their various components, different features may be analyzed and given more or less weight, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *See In re Nat'l Data Corp.*, 224 USPQ at 751; *see also Coach Servs., Inc. v.*

*Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) ("It is well-established that it is improper to dissect a mark, and that marks must be viewed in their entireties. In some circumstances, however, one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark.") (citations omitted); *Joel Gott Wines LLC v. Rehoboth Von Gott Inc.*, 107 USPQ2d 1424, 1430 (TTAB 2013) (citing *Price Candy Co. v. Gold Medal Candy Corp.*, 220 F.2d 759, 105 USPQ 266, 268 (CCPA 1955)).

The only notable difference between the PIERCE ARROW SOCIETY typed mark of the '801 registration and the applied-for PIERCE-ARROW standard character mark is the inclusion of the descriptive and possibly generic term SOCIETY at the end of Opposer's mark, a term which has been disclaimed. Matter that is descriptive of or generic for a party's services is typically less significant or less dominant in relation to other wording in a mark. *See In re Dixie Rests., Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997). PIERCE ARROW is thus the dominant term in Opposer's mark, which, but for the missing hyphen, is identical to Applicant's entire mark. The presence of the hyphen in Applicant's mark does not distinguish it from Opposer's mark. *See, e.g.*, *Thymo Borine Lab. v. Winthrop Chem. Co.*, 155 F.2d 402, 69 USPQ 512, 514 (CCPA 1946) (hyphen in mark THY-RIN has "no significance in speech"); *Mag Instrument Inc. v. Brinkmann Corp.*, 96 USPQ2d 1701, 1712 (TTAB 2010) (MAGNUM without hyphen is "essentially identical" to MAG-NUM with hyphen), *aff'd mem.*, 2011 WL 5400095 (Fed. Cir. Nov. 9, 2011). We therefore find the marks highly similar in appearance, sound and connotation.

With regard to commercial impression, Applicant argues:

> [S]ince the Opposer is concededly a society and foundation, the PIERCE ARROW element of its marks is understood to be a further descriptive feature of the type of society and foundation that the Opposer is, leaving a distinct "commercial impression[ ] directed to the antique PIERCE ARROW automobile." In contrast, the Applicant's PIERCE-ARROW mark is for automobiles, but the mark, as it would be encountered by a reasonable consumer on a modern automobile, does not generate a commercial impression "directed to the antique PIERCE ARROW automobile," as the Opposer's marks concededly do. Thus, the marks are not similar in their commercial impression. (citation to record omitted.)[44]

Applicant's argument directed toward the asserted descriptiveness of PIERCE ARROW in Opposer's mark is in essence an attack on the validity of Opposer's registration. The Board cannot entertain such an attack absent a counterclaim or petition to cancel the registration. *Edom Labs. Inc. v. Lichter*, 102 USPQ2d 1546, 1546, n. 6 (TTAB 2012) (Board will not consider collateral attack on the validity of opposer's pleaded registration absent properly filed counterclaim); *see also In re Nat'l Data Corp.*, 224 USPQ at 752 n.8 (argument that registered mark is generic "would require the filing of a petition to cancel the registration"). Moreover, a claim of mere descriptiveness is not available against Opposer's registration, which is more than five years old. *See* Section 14 of the Trademark Act, 15 U.S.C. § 1064.

There is nothing in the marks that will lead consumers to conclude there are different sources for antique and modern automobiles, and the inclusion of the term SOCIETY in Opposer's mark does not change the overall commercial impression of

---

[44] Applicant's brief at 24, 49 TTABVUE 30.

the marks. In addition, as further discussed below, there is nothing in the identification of services of the '801 registration that limits Opposer's membership to owners of antique PIERCE-ARROW automobiles. We therefore find that the commercial impression of the marks is also highly similar.

    b.  Goods and Services

We next consider whether there is a relationship between "automobiles" and "indicating membership in a national organization whose aim is to foster and preserve interest in Pierce Arrow motor cars." It is imperative that we consider the goods and services as identified in the respective identifications. *Octocom Sys., Inc. v. Houston Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) ("The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application …."). *See also Paula Payne Prods. v. Johnson Publ'g Co.*, 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973) ("Trademark cases involving the issue of likelihood of confusion must be decided on the basis of the respective descriptions of goods"). We do not read limitations into the identifications of either party, *see Squirtco v. Tomy Corp.*, 697 F.2d 1038, 216 USPQ 937, 940 (Fed. Cir. 1983) ("There is no specific limitation and nothing in the inherent nature of [registrant's] mark or goods that restricts the usage of SQUIRT for balloons to promotion of soft drinks. The Board, thus, improperly read limitations into the registration"), but if a registrant or an applicant has included limitations in its identification of goods or services, we do not ignore them. Thus, in this case, because Opposer's collective membership mark is used by members of an organization who own or are interested in PIERCE-ARROW branded cars, the

membership mark is limited to those with an interest in preserving and fostering interest in such automobiles. Applicant's automobiles, when produced, would be so branded.

Further, it is well established that the goods of Applicant and the membership services of Opposer need not be similar or competitive, or even offered through the same channels of trade, to support a holding of likelihood of confusion. It is sufficient that they are related in some manner, and/or that the conditions and activities surrounding the marketing of the cars and membership services are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same producer or source. *See, e.g.*, *Coach Servs., Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1722; *Hilson Research, Inc. v. Soc'y for Human Res. Mgmt.*, 27 USPQ2d 1423, 1432 (TTAB 1993); *In re Int'l Tel. & Tel. Corp.*, 197 USPQ 910, 911 (TTAB 1978).

In the present case, which involves a collective membership mark, we are concerned with whether current or prospective members of Opposer's organization would be likely to believe that Opposer's organization sponsors or is affiliated with Applicant's automobiles. Similarly, we must consider whether prospective consumers of Applicant's automobiles, as prospective members (or perhaps even current members) of Opposer's organization, would believe there was some affiliation.

The respective identifications reflect a clear and immediate relationship. Opposer's collective membership mark identifies its organization's focus on PIERCE-ARROW automobiles. Applicant's goods are PIERCE-ARROW automobiles.

Opposer's identification does not specify whether the PIERCE-ARROW motor cars in which its members are interested, or have ownership interests, are new or used; we therefore construe the identification to include both new and used PIERCE-ARROW motor cars, and as indicating membership in a national organization whose aim is to foster and preserve interest in motor cars that would encompass Applicant's automobiles. The wording of the parties' identifications alone establishes a clear relationship between Applicant's goods and Opposer's collective membership services.

Applicant argues that "for goods to simply be 'complementary' or 'used together' is not enough to establish their relatedness," and "in such circumstances, 'a persuasive evidentiary showing of relatedness between the goods and services at issue' is required,"[45] citing *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1086-87 (Fed. Cir. 2014). In *St. Helena Hosp.*, however, the Federal Circuit applied this principle only to situations where the "relatedness of the goods and services is obscure or less evident," and recognized that "each case must be decided on its own facts and the differences are often subtle ones." *Id.* at 1087. In the case before us, the identifications themselves establish the necessary relationship between the goods and the collective membership services; additional evidence of a relationship is not needed. A relationship may be found even in the absence of evidence beyond the identifications themselves. *See, e.g., Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 101, 1004 (Fed. Cir. 2002) (when addressing the issue of

---

[45] Applicant's brief at 27, 49 TTABVUE 33.

likelihood of confusion, the court held that the respective identifications of goods were, themselves, evidence of the relatedness of the parties' goods, and extrinsic evidence of relatedness was not per se required).

Applicant also points us to the Federal Circuit's decision in *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059, 1064 (Fed. Cir. 2003) where that court found that substantial evidence did not support the Board's conclusion that beer and restaurant services were related goods and services. *Id*. at 1063. Applicant argues that "[h]ere there is no evidence, let alone persuasive evidence, that the goods and services are related. Even more so than in *Coors*, where there was some evidence of relatedness, the only reasonable conclusion here is that the goods and services are not sufficiently related to support a finding of a likelihood of confusion." The Federal Circuit's decision in *Coors* actually supports a finding that the goods and collective membership services are related insofar as the decision recognized that, in contrast to beer and restaurant services that were not clearly related, there could be a "clear" relationship between brewpubs and beer – even without evidence:

> This case would be different … if the registrant's mark had been for a brewpub or for restaurant services and beer. In that case, the goods and services associated with the two marks would clearly be related and the case for a likelihood of confusion therefore much stronger.

*Id*. at 1064. *See also Hewlett-Packard Co. v. Packard Press, Inc.*, 62 USPQ2d at 1005 (finding "electronic transmission of data and documents via computer terminals" related to "facsimile machines, computers, and computer software").

As with the "clear" relationship between beer and brewpubs, a product and a service featuring the same product, Applicant's automobiles and Opposer's membership services involving the same-branded automobiles are "clearly" related.

Applicant made of record several third-party registrations to establish that "the goods and services at issue in this case do not generally arise from the same source, and that a reasonable consumer would not think of the Opposer as associated with the manufacture of automobiles in any way."[46] The following are the most pertinent:

| Collective Membership Mark | Product Mark |
|---|---|
| Registration No. 3692199 for "[c]lub services, namely, promoting the interests of Antique automobile owners; [p]roviding a website featuring on-line registration services for car club membership," owned by Auburn Cord Duesenberg Club Inc. | AUBURN, Registration No. 1044774, for "automobiles," owned by Matthew Ospeck. <br><br> CORD, Registration No. 4755542, word and design mark for goods including "[a]ntique automobiles and original and replacement parts thereof," owned by Cord Automobile Companies, LLC. <br><br> DUESENBERG, Registration No. 1276872, word and design mark for "[a]utomobiles," owned by Brightcliff Limited Corporation. |
| PACKARD, Registration No. 3082140, stylized mark for services including "association services, namely, promoting the interests of aficionados of Packard automobiles who are dedicated to the maintenance, preservation, authentic restoration and use of Packard motor vehicles," owned by Packard Automobile Classics, Inc. d/b/a The Packard Club. | PACKARD, Registration No. 2056783 for "automobiles and structural parts therefore," owned by Packard Holdings, Inc. |

---

[46] Applicant's brief at 28, 49 TTABVUE 34.

| Collective Membership Mark | Product Mark |
|---|---|
| STUDEBAKER DRIVERS CLUB INC., Registration No. 4244385, word and design mark for "[c]lub services, namely promoting the interests of Studebaker vehicle drivers," owned by Studebaker Drivers Club, Inc. | STUDEBAKER, Registration No. 4705734, for goods including "[v]ehicles, namely, automobiles," owned by Data Access (ASRL France). |

The registration for the AUBURN CORD DUESENBERG design mark is inapposite because its identification of services is limited to antique cars, unlike Opposer's registration. We find that the remaining two third-party registrations are too few in number to override the clear and explicit relationship exhibited in the application and registration. In addition, we think they are of limited probative value because (i) we do not know the circumstances under which these marks registered, and (ii) the Board is not bound by decisions of examining attorneys. *See In re Nett Designs Inc.*, 57 USPQ2d at 1566 ("Even if some prior registrations had some characteristics similar to Nett Designs' application, the PTO's allowance of such prior registrations does not bind the Board or this court.").

Mr. Linden testified as follows in support of Applicant's position that the goods and services are not related:

> 27. Based on my experience in the industry, I am aware of numerous other historical preservation associations, similar to the Society [i.e., Opposer], whose aims are to foster and preserve interest in specific brands of classic motor vehicles, such as Pierce-Arrow motor vehicles. In my experience, these historical preservation associations are organized as not-for-profit organizations, similar to the Society. Some of these other historical preservation associations include Auburn-Cord-Duesenberg Club, Buick Club of America, Walter P. Chrysler Club, Cadillac-LaSalle Club, Edsel Owners Club, Tucker Automobile Club of America, Hudson Essex-Terraplane Club, Lincoln Continental Owners Club, Oldsmobile Club of America,

Packards International, Pontiac–Oakland Club, Studebaker Drivers Club, and more.

28. I am aware of no historical preservation association, including that of the Society, whose aim is to foster and preserve interest in a specific brand of classic motor cars that also sells, endorses, or sponsors new automobiles of any type, or that manufactures automobiles.

29. Further, based upon my familiarity with these historical preservation associations, it would be inconsistent with their being organized as not-for-profit organizations, and their stated missions of fostering and preserving interest in specific brands of classic cars, to be selling, endorsing, or sponsoring new automobiles of the same name, or manufacturing automobiles of the same name.

30. Therefore, based on the foregoing, it is my opinion that the goods set forth in SpinTek's application (i.e. automobiles) are not related to the Society's collective membership organization, which aims to foster and preserve interest in specific brands of classic cars, and which has no connection to new automobiles, including the manufacture of automobiles.[47]

As noted, Opposer's services as identified are not restricted to historical vehicles. Mr. Linden's testimony concerns only classic cars but Opposer's services are not limited to classic cars. Mr. Linden's testimony as it pertains to the goods and services therefore can be discounted. In addition, the question we must decide is not whether experts on historical preservation associations, who know how such associations generally operate, would believe there was an association between a PIERCE ARROW SOCIETY and PIERCE-ARROW automobiles. Rather, our focus is on

---

[47] Linden Decl. ¶¶ 27-30, 37 TTABVUE 36-37.

whether automobile purchasers, who cannot be presumed to share Mr. Linden's knowledge, would believe such a connection exists.

In sum, the third-party registrations and testimony do not persuade us that consumers would view the goods and collective membership services involving the same goods as unrelated. There is an explicit and complementary relationship between automobiles and automobile clubs for the very same brand of automobiles. In this case, the PIERCE ARROW SOCIETY is a collective membership organization for people who have an interest in preserving and fostering interest in PIERCE-ARROW automobiles. Relevant persons would be likely to assume a connection or affiliation with or sponsorship by the owner of the automobile trademark if a trademark for an automobile is used as, or as part of, a collective mark indicating membership in an automobile club.

c. Trade Channels

Turning to trade channels, in the absence of specific limitations in each registration, we must presume that the identified automobiles and membership services will be marketed in all normal and usual channels of trade and methods of promotion. *Squirtco v. Tomy Corp.*, 216 USPQ at 939.

Applicant argues that the trade channels differ, pointing out that "[a]utomobiles are sold through dealerships"[48] while Opposer's marks are displayed on identification

---

[48] Applicant's brief at 30, 49 TTABVUE 36.

badges at events sponsored by Opposer, on membership cards and in various publications.[49] Mr. Linden testified:

> 40. [G]enerally, consumers are exposed to historical preservation associations through classic car events, at museums with which those associations are connected, or through other public promotional campaigns that such associations conduct.
>
> ***
>
> 44. In contrast, new automobiles are typically sold through automobile dealerships.
>
> 45. … I have not seen new automobiles being sold at classic car events, and I am not aware of any historical preservation association that sells or promotes new automobiles through its website.
>
> 46. In my opinion, it is highly unlikely that consumers would encounter the Society and its marks, and any new automobiles under the PIERCE-ARROW mark under similar market conditions.

Again, because Opposer's collective membership services as identified are not limited to classic cars, we do not accept Applicant's characterization of Opposer as limited to an historical preservation association. Opposer's identification states that Opposer's "aim is to foster and preserve interest in Pierce Arrow motor cars," which cars are the same cars (at least by name) that Applicant intends to manufacture. Mr. Linden says nothing about the trade channels of new PIERCE-ARROW automobiles and car associations for owners of new PIERCE-ARROW automobiles. Further, even though the record is bare of evidence to suggest, for example, that Applicant's automobiles and Opposer's collective membership services would be advertised side

---

[49] Opposer's Answer to Int. No. 17, 30 TTABVUE 19.

by side or in the same publications or venues, people who own new PIERCE-ARROW automobiles would also be expected to encounter PIERCE ARROW car association activities (not limited to antique PIERCE-ARROW motor cars) or offers of membership in such associations.

Of course, Opposer's identification of services encompasses the preservation of interest in antique PIERCE-ARROW motor cars. The record reflects that Opposer has a website, operates a museum on the grounds of the Gilmore Car Museum in Hickory Corners, Michigan, has "public promotions sponsored by Opposer that display legitimate PIERCE-ARROW automobiles,"[50] and participates in the Hershey, Pennsylvania Annual Flea Market through a large tent containing a number of PIERCE-ARROW automobiles.[51] Members of Opposer's organization may not own only antique automobiles, they may also own modern automobiles. Thus, once Applicant promotes its automobiles, it is likely that the same individuals will be exposed to both Applicant's and Opposer's marks for their respective goods and services.

In sum, we find that the trade channels differ, but that the consumers of Opposer's services and Applicant's goods overlap.

### d. Strength of Opposer's Mark, Including the Number and Nature of Similar Marks in Use in Connection With Similar Goods and Services

Opposer argues that its activities result in "significant" public exposure to classic PIERCE-ARROW automobiles "and the heritage of that product line," and that "such

---

[50] Opposer's Answer to Int. No. 18, 30 TTABVUE 19-20.

[51] Hamburger Decl. ¶ 10, 21 TTABVUE 5.

activities result in an awareness of – and interest and residual goodwill in – PIERCE[-]ARROW automobiles among a significant portion of the general automotive public."[52] Opposer relies on the same evidence discussed above in connection with "fame" in the Section 2(a) context. For the same reasons stated above as to why that evidence is not persuasive, we find the evidence submitted by Opposer does not imbue Opposer's mark with any enhanced strength in the Section 2(d) context. The record, however, contains no evidence of use by third parties of the term PIERCE ARROW. We find on balance that Opposer's mark is entitled to a scope of protection broad enough to encompass Applicant's mark.

    e.  Conditions of Sale: Careful Selection of Goods and Services; Sophistication

Applicant argues that consumers of Applicant's automobiles would exercise a high degree of care in making purchasing decisions; that Opposer's members are "sophisticated consumers exercising a high degree of care and diligence"; and that "the likelihood that … consumers would be confused into thinking that modern automobiles manufactured by the Applicant would have any connection to the Opposer is extremely low."[53] Mr. Linden testified as follows on the issue of sophistication and care in purchasing:

> 47. Based upon my experience related to purchases and sales of automobiles, it is my opinion that purchasers of automobiles are generally careful purchasers because of the cost of such purchases to consumers.

---

[52] Applicant's brief at 13, 49 TTABVUE 19.

[53] Applicant's brief at 30-31, 49 TTABVUE 36-37.

48. Similarly, based on my experience, it is my opinion that purchasers of collector automobiles are careful purchasers because of the relatively significant cost of such purchases to consumers.

49. In addition, those consumers that are interested in classic and collector motor vehicle brands are generally careful because lack of diligence prior to a purchase can result in a purchaser paying too much for a vehicle relative to its actual value.

50. Further, consumers of certain classic and collector motor vehicles are also generally highly sophisticated. First, the intrinsic value of classic motor vehicles, such as classic Pierce-Arrow motor vehicles, is primarily driven by the originality of the vehicle and its components. Therefore, consumers of classic and collector motor vehicles generally have some degree of knowledge to evaluate, or have an expert evaluate, or otherwise must be aware of the significance of, the originality of the parts of the vehicle and its components as it bears on the value.

51. Second, value can also be affected by a number of extrinsic "historical" factors, such as who were the prior owners of the vehicle, the historical significance of the vehicle (if applicable), historical documentation, and any awards that the vehicle might have garnered, collectively referred to as "provenance."

52. Therefore, in my opinion, purchasers of certain classic and collectible automobiles are sophisticated and diligent purchasers.[54]

We agree with Mr. Linden's testimony that automobiles are costly and that care goes into their selection and purchase. The remainder of his testimony, however, is not particularly relevant because Opposer's collective membership services as identified do not include the sale of classic motor vehicles. Mr. Linden has testified that that the cost of an annual membership in Opposer's organization is $45. This is

---

[54] 27 TTABVUE 10-11.

not a significant sum, and, we find that the relatively low cost of the membership suggests less care by consumers in making decisions about joining Opposer's organization.

As for the sophistication of the relevant persons considering Opposer's collective membership services and aware of Applicant's goods or vice versa, even if sophisticated in their purchasing decisions, this does not necessarily mean that they are immune to source confusion. It is well-settled that even careful or sophisticated purchasers who are knowledgeable as to the goods or services are not necessarily knowledgeable in the field of trademarks or immune to source confusion arising from the use of very similar marks on or in connection with goods and services. *See In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1690 (Fed. Cir. 1993); *In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1204 (TTAB 2009).

Overall, the *du Pont* factor relating to the conditions under which and the buyers to whom sales are made weighs slightly against a finding of likelihood of confusion.

f.   Lack of Actual Confusion

Applicant argues that the fact that "Opposer points to not one single instance where a consumer mistakenly believed that the Opposer was the source of those [automobiles long ago manufactured by The Pierce-Arrow Motor Car Company] … or mistakenly believed that Opposer is or was in any way directly or indirectly related to The Pierce Arrow Motor Car Company and its automobiles" weighs strongly against a finding of likelihood of confusion.[55] Applicant's apparent point is that

---

[55] Applicant's brief at 34, 49 TTABVUE 40.

because there are no instances of reported confusion as to the source of the antique PIERCE-ARROW automobiles and Opposer, confusion would not be likely as to the source of new PIERCE-ARROW automobiles and Opposer. Mr. Linden, however, has testified that "in my experience, consumers understand that such newly revived brands are not related to groups aiming to foster and preserve interest in the dead brand and museums devoted to the dead brand."[56] Mr. Linden's testimony, however, assumes that a consumer would know that a brand is a "revived brand" which we do not accept. In addition, we point out that while evidence of actual confusion may be considered in the *du Pont* analysis, "a showing of actual confusion is not necessary to establish a likelihood of confusion." *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002) (citing *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 218 USPQ 390, 296 (Fed. Cir. 1983)). Moreover, Applicant's application is based on intent to use, and there is no evidence that there has been any meaningful opportunity for actual confusion to arise.

g. Conclusion on Likelihood of Confusion

We have considered all of the evidence of record as it pertains to the relevant *du Pont* factors, including all of the parties' arguments and evidence, even if not specifically discussed herein. The marks are highly similar, Opposer's membership services and Applicant's automobiles are related and are, or will be, offered to the same relevant persons. Opposer has not established any particular strength in its mark but Opposer's mark is strong enough so that its rights extend to protection

---

[56] Linden Decl. ¶ 68, 27 TTABVUE 14.

against very similar marks such as Applicant's mark. The cost of new automobiles suggests a high level of care by purchasers of automobiles, but the relatively low cost of a membership in Opposer's organization suggests a low level of care by consumers in making decisions involving Opposer's services; and even if sophisticated in their purchasing decisions, this does not necessarily mean that they are immune to source confusion. Relevant persons are likely to assume a connection or affiliation with or sponsorship by Opposer if Applicant's mark is used for automobiles. Opposer has therefore established by a preponderance of the evidence that Applicant's mark PIERCE-ARROW for "automobiles," is likely to cause confusion with the registered mark PIERCE ARROW SOCIETY for "indicating membership in a national organization whose aim is to foster and preserve interest in Pierce Arrow motor cars."

**Decision:** Opposer's Section 2(a) claim is dismissed. Opposer's Section 2(d) claim is sustained with respect to Registration No. 1058801 and registration to Applicant of its mark is refused.